Vera DRAPER, et vir, Appellants,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Appellee.

No. 8078.

Court of Civil Appeals of Texas, Texarkana.

July 25, 1972.

Rehearing Denied Aug. 29, 1972.

Leighton Cornett, Cornett, Echols & Biard, Paris, for appellants.

William J. Lipscomb, Moore & Lipscomb, Paris, for appellee.

CHADICK, Chief Justice.

This is an appeal from a final judgment in a Workmen's Compensation Law case (Vernon's Tex.Rev.Civ.Stat.Ann. Art. 8306 et seq.). In trial pleadings, it was alleged that Mrs. Vera A. Draper was injured and incapacitated while employed by Campbell Soup Company. Liberty Mutual Insurance Company was sued as the employer's compensation insurer. Included in the jury's verdict upon the special issues submitted was a determination in response to Special Issue No. 13 that Mrs. Draper's incapacity was caused solely by a natural cause or causes, or disease, injuries, or a combination thereof, existing prior to February 18, 1969, the date of her alleged compensable injury.

After a take-nothing judgment was entered in the Trial Court denying Mrs. Draper a recovery, a timely motion for new trial was filed in her behalf. Following the original motion for new trial, in due order and time, an amended motion for new trial was filed. Neither Mrs. Draper's motion for new trial nor her amended motion therefor mentioned Special Issue No. 13, the verdict thereon or its substance. Approximately two weeks after filing the amended motion, Mrs. Draper caused to be filed a third instrument which was labeled and internally referred to as "Second Amended Motion for New Trial." In this, the Second Amended Motion for New Trial, the existence, sufficiency and weight of the evidence as it relates to Special Issue 13 is first set up as grounds for new trial. Five days after filing the Second Amended Motion for New Trial, and after having first obtained leave of the Court, Mrs. Draper filed a fourth instrument labeled and described internally as a supplemental pleading to the First Amended Motion for New Trial. This pleading, the fourth in the series, in language identical with that used in the Second Amended Motion for New Trial, set up as grounds for new trial no evidence to support the jury's verdict on Special Issue 13, *insufficient evidence* therefor, and that such *verdict was contrary to the great weight and preponderance of the evidence.*

From the foregoing recitations, it is apparent that Mrs. Draper filed an original motion for new trial and amended it one time. Such pleading was authorized by and conformable with Texas Rules of Civil Procedure, rule 329b. That rule provides that a motion for new trial, when required, shall be filed within ten days after rendition of the complained of judgment or other order, and that when an original motion for new trial is filed within the ten-day period, it may be amended without leave of the Court, provided the amended motion shall be filed before the original motion is acted upon and within twenty days after the original motion for new trial is filed. Additionally, in the clearest of language, the rule states that not more than one amended motion for new trial may be filed. Beyond question Mrs. Draper's second amended motion for new trial and her pleading supplementing the first amended motion for new trial, adding new and previously unstated grounds for new trial, are prohibited by Rule 329(b) and by operation of the rule could not validly present the issues tendered thereby.

In view of the conclusions expressed the jury's verdict on Special Issue No. 13 is unchallenged as a viable verdict of the jury. The verdict thereon supports the judgment of the Trial Court. The judgment of the Trial Court, therefore, is affirmed.

DAVIS, Justice (dissenting).

I dissent. Mrs. Vera A. Draper, hereinafter referred to as Mrs. Draper, in 1965, made application to Campbell Soup Company in Paris, Lamar County, Texas, for a job as a common laborer. She was required to take a physical examination. The doctor who examined her found her to be in A–1 condition, without any prior disability, physical impairment, injury, or injuries, natural causes, disease or some physical condition or a combination thereof

that would keep her from making an excellent employee. She was required to take another physical examination in 1968. She passed that physical examination, also, in A–1 condition. Each of the examinations that were made of her showed her to be physically able to do manual labor. She made Campbell Soup Company a regular employee until February 18, 1969. On February 18, 1969, when she started to lunch, she stepped on a slick place or some cleaning fluid that was on the floor which the cleaning man, or safety man, did not properly remove. When she stepped on this slick place on the floor, she fell down striking her right hip, or buttocks, and her right elbow on the floor. The fall hurt her back, hip, right leg and right arm. She went to the Medical Center that day and saw the head nurse and also saw Dr. Charles E. Beachley. She was given certain treatments but was sent back to work.

Dr. Beachley continued to treat her throughout her period of employment, but she was consistently complaining about pain in her back and tenderness in the lumbosacral area. There is some medical testimony that there was an angle in the lumbosacral area after the injury. Apparently, this was not present at either time she received a physical examination. There is no evidence in the record she had ever received any physical injury prior to February 18, 1969, or she had suffered any prior disability, physical impairment, injury or injuries, natural causes, disease or any physical condition or a combination thereof, that would keep her from making an excellent employee. She did not receive any other injuries at any time after February 18, 1969, except minor injuries, until the date she was given a medical discharge.

Dr. Beachley testified that they did have some x-ray evidence of back trouble that showed a lumbosacral angle after February 18, 1969. There is no evidence of any lumbosacral angle of her spine at either of the examinations. Therefore, it seems that the lumbosacral angle of the spine must have been caused by the fall which occurred when she fell on the concrete floor.

Dr. Beachley testified there was a continuation of the limitation of straight leg raising, but he could not find any muscle spasm objectively at all. A careful check on the record will reveal that a Dr. Clarence Temple, an orthopedic surgeon who examined Mrs. Draper for the Campbell Soup Company, did find some muscle spasm in her back at one time when he saw her.

During the time that Mrs. Draper continued to work for Campbell Soup Company after the injury, she was sent to see her private physician about a stye on her eye and at one time about her gallbladder. There may have been another time or two she was sent to her private physician, but each time the trouble completely cleared up in the near future, she returned to Campbell Soup Company and went back to work.

It seems that Mrs. Draper was trying her dead level best to make a good hand and make the Campbell Soup Company a good employee. The record is full of physical therapy treatments of Mrs. Draper, but the back pain and the numbness of the right foot was so great that she could not continue to work, according to Dr. Beachley. Therefore, Dr. Beachley decided that she was suffering from neurosis and he gave her a medical leave of absence on September 4, 1970.

During the time that Dr. Beachley treated Mrs. Draper, he gave her Darvon capsules, Rovaxisal, Salicylate, and Electric Stimulation to the low back. This was in addition to the physical therapy and another treatment called ultrasonic therapy. All the medicine that was given to her was a muscle relaxant. It was given to her to relieve her of the pain in her back. The electric stimulation and ultrasonic therapy to the low back was given also for the same purpose.

It seems after Dr. Clarence Temple started to examine her, he discovered that

she had osteoperosis of the spine (a softening of the bone of the spinal column). There is no evidence that this occurred prior to February 18, 1969. Counsel for Mrs. Draper never did go in to the curvature of the spine as the cause of her back pain, but he did get from Dr. Beachley the testimony that osteoperosis of the spine and an injury thereto in the low back, meaning muscle strain which refers to the pulling or tearing of muscle fiber, and should add in there muscle or ligament strain in this case. This causes pain in the fibers, the muscles and the other ligaments.

If the osteoperosis of the spine occurred while Mrs. Draper was working for Campbell Soup Company and after February 18, 1969, and she received an injury to her back which caused a curvature of the spine, she is entitled to Workmen's Compensation benefits. Art. 8306, Sec. 20 R. C.S.

As soon as Mrs. Draper was discharged from her employment on medical leave of absence, she secured the services of an attorney of her choosing, filed a Notice of Injury and a claim for compensation with the Industrial Accident Board. The Insurer contested the claim because it had not been filed within six months after the alleged injury. The Industrial Accident Board overruled the contest and granted Mrs. Draper total and permanent disability and ordered the Insurer to pay her $35.00 per week for 401 weeks.

The Insurer, Liberty Mutual Insurance Company, excepted to the award of the Industrial Accident Board, gave notice of appeal and filed suit in the District Court of Paris, Lamar County, Texas, to set aside the ruling. Mrs. Draper, joined by her husband, Vernon Draper, filed an answer thereto together with a cross-action.

In Appellants' answer and cross-action, they alleged that Mrs. Draper had not timely filed her notice of injury and claim for compensation with the Industrial Accident Board within six months because she had a valid reason for not doing so and she was kept on as an employee of Campbell Soup Company from February 18, 1969, until September 4, 1970. In Appel-

lee's answer, it alleged that Mrs. Draper had not timely filed her notice of injury and claim for compensation with the Industrial Accident Board and if she has, or has had any disability, physical impairment, or loss of wage earning capacity, it is not the result of an injury received by her while in the employ of Campbell Soup Company, but is solely due to prior or subsequent injuries, natural causes, disease or some physical condition, or a combination thereof, wholly separate from and in no way associated with her said employment.

The jury answered the special issues that Mrs. Draper did receive an injury to her body on February 18, 1969; it was accidental; she was acting in the course of her employment with Campbell Soup Company when she received such injury; she did not receive any total incapacity to labor on account of her injury; she did not suffer any partial incapacity to labor as a result of her injury; her incapacity to labor *is due solely* to a natural cause or causes, or disease, injuries or a combination thereof, *existing prior* to February 18, 1969; her incapacity *is not due* solely to a natural cause or causes, or disease, injuries or a combination thereof, *existing after* February 18, 1969; Mrs. Draper did not believe within six months from the date of such injury on February 18, 1969, her injuries were not serious; the jury found from a preponderance of the evidence that such belief caused Mrs. Draper to delay in filing a claim for compensation with the Industrial Accident Board until such claim was filed; and, they found from a preponderance of the evidence that such belief *was good cause* for her delay in filing the claim for such period of time.

The judgment was signed and entered on April 22, 1971, denying Mrs. Draper any recovery whatever. Appellants filed their original motion for new trial on April 27, 1971, within ten days after the original judgment was signed and entered. Within twenty days thereafter, on May 13, 1971, Appellants filed their first amended motion for new trial. The record does not reveal anything about the first amended

motion for new trial being overruled on May 27, 1971, except in the motion where he overruled the first amended motion for new trial, as supplemented, on May 28, 1971. Appellants presented to the trial court a supplemental pleading on May 28, 1971, whereby they sought to supplement their first amended motion for new trial. The trial court, acting within his sound discretion, granted the Appellants' motion and permitted them to file the supplemental pleadings to their first amended motion for new trial. The trial court made a notation at the end of the supplemental pleading, in his own handwriting, and signed his name thereto. Then, according to the transcript, the trial court set aside the order overruling the first amended motion for new trial which had been signed and entered on May 27, 1971, and on May 28, 1971, overruled Appellants' first amended motion for new trial with their supplemental pleadings thereto. This motion was signed and ordered entered on May 28, 1971. This was within 30 days after their first amended motion for new trial was filed.

Appellee has filed a motion to dismiss the appeal for want of jurisdiction and rely upon Tex.R.Civ.P. 329(b). It is true that only one first amended motion for new trial may be filed under Tex.R.Civ.P. 329(b). This part of the rule is mandatory. A second motion is a nullity, but there is nothing in the rule that says anything about the first amended motion for new trial, with leave of the trial court, may, or may not, be supplemented. Under Tex.R. Civ.P. 1, the courts are bound to give the Texas Rules of Civil Procedure the broadest construction whatever. See the many cases cited thereunder.

In all civil cases that are tried in Texas, a supplemental pleading is allowed, with leave of the trial court, at various stages of the trial. In cases tried before a jury, a supplemental pleading may be permitted by the trial court after the charge has been prepared and before it had been read to the jury. I think that the supplemental pleading to the first amended motion for new trial should be allowed to stand. Tex.R.Civ.P. 69, 71, 72, and the authorities cited under each Rule. I would overrule the motion to dismiss the appeal for lack of jurisdiction.

Appellants bring forward six points of error. They say the trial court erred for the reason that the answer of the jury in response to Special Issue No. 4 that Mrs. Draper did not sustain any total incapacity to labor on account of the injuries received is without support in the evidence; in failing to grant Appellants' motion for new trial for the reason that the answer of the jury in response to Special Issue No. 8 that Mrs. Draper did not sustain any partial incapacity on account of the injuries received is without support in the evidence; failing to grant Appellants' motion for new trial for the reason that the answer of the jury in response to Special Issue No. 8 that Mrs. Draper did not sustain any partial incapacity on account of the injuries received is against the great and overwhelming weight and preponderance of the testimony and evidence and is clearly wrong and unjust; in failing to grant Appellants' motion for new trial for the reason that the answer of the jury in response to Special Issue No. 13 that Mrs. Draper's incapacity was due solely to a natural cause or causes or disease, injuries, or a combination thereof existing prior to February 18, 1969, is without support in the evidence; and, in failing to grant Appellants' motion for new trial for the reason that the answer of the jury in response to Special Issue No. 13 that Mrs. Draper's incapacity was due solely to a natural cause or causes or disease, injuries, or a combination thereof existing *prior* to February 18, 1969, is against the great and overwhelming weight and preponderance of the testimony and evidence and is purely wrong and unjust.

In response to Appellants' points of error one through four, I think the evidence is fully sufficient to support the jury's answers thereto. In checking the charge of

the court, I find that the jury answered Special Issue No. 14 that from a preponderance of the evidence Mrs. Draper did not think within six months from the date of such injury from February 18, 1969, she believed that her injuries were not serious. The jury also answered Special Issue No. 15 that such belief caused Mrs. Draper to delay filing a claim for compensation with the Industrial Accident Board until such claim was filed. The jury also found in answer to Special Issue No. 16 that from a preponderance of the evidence such belief was a good cause for her delay in filing the claim for such period of time. The trial court then gave the jury the following instruction as to what constitutes a "good cause:" "A person has 'good cause' for delay in filing a claim when he has prosecuted his claim with such diligence as an ordinarily prudent person would have used under the same or similar circumstances." We also believe the evidence is fully sufficient to support the answers of the jury to Special Issues Nos. 14 and 15. In re King's Estate, 1952, 150 Tex. 662, 244 S.W.2d 660; 38 Texas Law Review 361 (Chief Justice Robert W. Calvert); Pacific Employers Indemnity Co. v. Johnson, Tex.Civ.App., 1969, 448 S.W.2d 205.

I would sustain points of error one through four.

The jury answered Special Issue No. 13 that Mrs. Draper's incapacity was due solely by natural cause or causes, or disease, injuries, or a combination thereof existing *prior* to February 18, 1969. The jury answered Special Issue No. 13–A that Mrs. Draper's injuries or incapacity is not solely caused by such natural cause or causes, or disease, injuries or a combination thereof *after* February 18, 1969. I think these answers of the jury are conflicting. The finding of the jury to Special Issue No. 13 is challenged by Appellants' points five and six. The entire record of Mrs. Draper's employment with Campbell Soup Company was offered in evidence. Please bear in mind that Mrs. Draper was examined in 1965 and was found to be in excellent health. She was re-examined in 1968. Again, she was found to be in excellent health.

Appellee offered a movie photographic expert witness, Billy Bob Stuart, who resides in Dallas, Dallas County, Texas. Although, Appellee did not prove their expert witness had any expert training in movie photography. He testified that he was 26 years old at the time of the trial. He swore most positively that he took some pictures of Mrs. Draper on July 24, 1970, July 25, 1970, and March 24, 1971. He swore that he took these pictures movies on July 25, 1970 at 8:51 A.M., 9:03 A.M. and 9:30 A.M. at her residence. I will state here and now, *most positively*, that the pictures that he swore he took on July 24, 1970 and July 25, 1970 at her residence just is not so. The employment record of Campbell Soup Company shows that Mrs. Draper was on duty all during both of those days and a witness for the company so testified.

The expert witness further testified that about 20 feet of the film that was taken on July 24, 1970, was overexposed. He then testified that he had left that film at home and had cut and spliced the film, taken on July 25, 1970, and March 24, 1971, together and showed them to the jury.

Counsel for Appellants did not object to this testimony because a proper predicate had not been laid. The witness had not qualified as an expert movie photographer. Another thing, counsel for Appellants, permitted them not to show the overexposed film and permitted them to show the other films that had been cut and spliced together. I believe that if a movie photographer is going to show any film at all, he must show each film separately. In other words, the pictures he swore he took on July 24, 1970, even though they were overexposed, should have been shown to the jury first, without any cutting and splicing. Then the pictures he swore that he took on July 25, 1970, should have been shown to the jury separately. Then the pictures he

swore that he took on March 24, 1970, should have been shown to the jury separately. Another thing, counsel for Appellants did not interrogate the expert witness about movie pictures that can be taken at a slow rate of speed and shown at a faster rate of speed.

Mrs. Draper was about sixty years of age at the time of the trial. She was a little over five feet tall and weighed just a little over 100 pounds. This expert witness swore that he went to her home on the pretext of trying to locate someone else. He further told her he was in business in Dallas, Texas. This expert witness would not swear that he was "spying" on Mrs. Draper at the time he took the pictures and at the time he was making many trips to her residence to watch her. He swore he made a total of ten trips to her residence.

According to Webster's dictionary, the word "spy" or "spying" is defined as follows:

"One who keeps close and secret watch on the actions and words of another or others; to be on the lookout; keep watch; to examine or search closely or carefully; to observe (a person, place, enemy, etc.) secretively or furtively with hostile intent; to inspect or examine or to search or look for closely or carefully."

This witness merely said that he was keeping a "surveillance" over Mrs. Draper. The word "surveillance" as defined by Webster's dictionary is as follows:

"A watch kept over a person, group, etc. esp. over a suspect, prisoner, or the like; supervision or superintendence."

There is an article in No. 1, Vol. XXXIV, Baylor Law Review, page 108, that described an expert witness. Although, this writer does not completely agree with all of the "interrelation of the Rules" on page 18, nor with all of the "Conclusions" on page 119. It is an interesting article and one can learn much about it for the trial of cases if they will study the same.

If a movie photographer is to be considered as an expert witness, his qualifications would be proved up as a professional movie photographer. While it is not required that a person who took a still photograph be an expert movie photographer, some attorneys feel that the weight accorded the movie photograph will be greatly enhanced if the person who took it is qualified as an expert movie photographer. The basic curriculum includes the basics of movie photography, which in turn includes dimensional photography and aerial photography. It should not be hard to prove that a person is a graduate of some movie photographic college or university and his experience as such. In many situations, the qualifications of the movie photographer as an expert witness, assuming his credentials are impressive, will impress the jury and enhance the weight to be given the movie photographic exhibits. The qualifications of an expert witness as a movie photographer may be hazardous. The qualifications of the movie photographer as an expert witness is not altogether a one-way street. Unless the movie photographer is a true expert well versed in all phases of his field, he is vulnerable to the most searching cross-examination, since he lays his reputation and expertise on the line. A real good attorney, on cross-examination, could easily show that he was not qualified as an expert.

There is an extra consideration added, however, to motion picture photography which is not presented in still photography. This is the representation of speed. In effect, it gives us an additional dimension with which to work and be concerned. It affords a further vehicle for potential misrepresentation and distortion. The element of speed is encountered in two different impressions. The first is at the time the

motion picture is made, and the second at the time it is projected. Most films with which we are concerned in the courtroom are taken at either 16 frames a second or 24 frames a second. These two speeds give a reasonable approximation of normal motion and activity of the scene.

By the same token, projectors are designed to operate at a speed at either 16 frames a second or 24 frames a second. It follows, therefore, that a motion picture taken at 16 frames a second must be projected at this same speed; or, one taken at 24 frames a second must be projected at this same speed, to prevent misrepresentation of speed of motion.

Therefore, it all depends upon the angle of the camera, the speed at which it was taken and at which it was shown, the lens with which the pictures were taken and with which they were shown, in order to prevent a distortion of the movement of the object or person. See Houts, "Photographic Misrepresentations," published by Matthew-Bender Co.; 63 T.J.2d 497, Sec. 454, Note 6.

I would sustain points five and six.

If I am in error in holding that the Appellants could file a supplemental pleading to their first amended motion for new trial, with leave of the Court first had and obtained, I would still reverse the case because there is a conflict of the finding of the jury to Special Issue No. 13 and Special Issues Nos. 14 and 15. The jury had already found that she had slipped and fallen in the course of her employment from which she received an injury. Also, there is no evidence that Mrs. Draper had suffered any injury or impairment that would cause her to lose her wage earning capacity prior to February 18, 1969. As a matter of fact, under the record in this case, Special Issues Nos. 13 and 13a should not have been submitted to the jury.

I would reverse and remand the case for a new trial.